UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

              Plaintiff,

    v.                                Case No. 20-CR-185

LOUIS REY PEREZ, JR.,
    a/k/a "Pops,"

              Defendant.

---

## PLEA AGREEMENT

---

1.    The United States of America, by its attorneys, Richard G. Frohling, United States Attorney for the Eastern District of Wisconsin, and Gail J. Hoffman and Elizabeth M. Monfils, Assistant United States Attorneys, and the defendant, Louis Rey Perez, Jr., individually and by attorney Kathleen Quinn pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.    The defendant has been charged in a one-count Information, which alleges violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B) and 846 and Title 18, United States Code, Section 2(a). The defendant has also been charged in one count of a fifteen-count Indictment, which alleges violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), 846, and Title 18, United States Code, Section 2.

3.     The defendant has read and fully understands the charges contained in the Indictment and Information. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.     The defendant voluntarily agrees to waive prosecution by Indictment in open court.

5.     The defendant voluntarily agrees to plead guilty to the following counts set forth in full as follows:

**THE UNITED STATES ATTORNEY CHARGES THAT:**

1.     Beginning by at least January 2017, and continuing until on or about September 22, 2020, in the State and Eastern District of Wisconsin and elsewhere,

**LOUIS REY PEREZ, JR.,**
**a/k/a "Pops,"**

knowingly and intentionally conspired with other persons to possess with the intent to distribute and to distribute a mixture and substance containing a detectable amount of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

2.     With respect to the defendant, the amount involved in the conspiracy attributable to the defendant as a result of his own conduct, and the conduct of other co-conspirators reasonably foreseeable to him, is 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.

All in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B),

2

and Title 18, United States Code, Section 2(a).

6.     The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

### Summary of Investigation

In September 2018, law enforcement authorities identified Louis R. Perez III (a/k/a "Ocho," and a/k/a "Eight Ball"), also identified as a Mexican Posse gang member, as the individual spearheading a drug-trafficking organization (DTO) that was distributing large quantities of cocaine and marijuana throughout Milwaukee, Wisconsin, and elsewhere since at least January 2017. Law enforcement authorities also identified Xina Yang, Perez III's then girlfriend, as someone who worked hand-in-hand with Perez III to further the DTO. The DTO obtained cocaine and marijuana from California, either through couriers or through United Parcel Service (UPS) and FedEx. Perez III and Yang coordinated the package retrieval from various Milwaukee, Wisconsin, residences, oversaw a marijuana vape cartridge manufacturing operation located at a codefendant's residence, distributed marijuana and marijuana-related products under the name brand "Midwest Connect" or "Midwest Connected," and mailed drug proceeds to the California-based supplier.

Upon further investigation, authorities learned that, beginning in at least January of 2017, Julian Sanchez and/or Miguel Sarabia, Sanchez's father, who resided in California, supplied the Perez III DTO with bulk marijuana, marijuana edibles, marijuana oils/waxes, and marijuana vape cartridges.

During the course of the investigation, Title III orders authorized the interception of communications over seven telephones used by Perez III, Yang, Sanchez, and Sarabia, as well as the Snapchat account "Midwest_connect," used by Perez III. Collectively, these interceptions began on March 20, 2020, and continued through September 22, 2020, with the exception of small periods of time. The intercepted communications confirmed that Perez III obtained marijuana from Sanchez and Sarabia, that Perez III distributed the narcotics to mid-level distributors and suspected street-level users, and that Yang facilitated and coordinated the day-to-day DTO operations.

The investigation revealed that up until late 2019, Perez III and Yang frequently traveled to California on behalf of the DTO, many times staying for significant periods of time in hotels and Airbnb rentals. At this time, Perez III and Yang instructed other DTO members to manage the distribution of controlled substances in Milwaukee when they were in California.

On September 25, 2018, Louis R. Perez Jr., Perez III's father, was stopped in Utah with eight kilograms of cocaine in a trap compartment in his truck. Perez III and Yang drove separately, but traveled along with Perez Jr. from California to Wisconsin, communicating with Perez Jr. on two prepaid telephones activated before their departure from California. After Perez Jr. was stopped, Perez III and Yang also stopped, at which point Yang booked hotel rooms and airfare for herself, Perez III, and Perez Jr. upon his release from custody.

Beginning in November 2019, Perez III and Yang moved back to Milwaukee. At this time, the DTO's mode of operation switched to mailing controlled substances and proceeds between California and Milwaukee. Also at this time, Sanchez obtained hundreds of pounds of marijuana from growers in northern California. Sanchez, along with Gabriel Matteson, packaged and sent the marijuana through FedEx and UPS to numerous addresses in Milwaukee, Wisconsin. Perez III and Yang regularly tracked the controlled substance packages' whereabouts. They also coordinated the package retrieval from various Milwaukee residences.

Court authorized interceptions, combined with physical surveillance, reflect that the Perez III DTO received at least 200 packages, believed to contain marijuana and THC oil, which have been delivered by FedEx and UPS, to at least eight different addresses. DTO package recipients included Jose Alvarado, Shayla Knueppel, Mercedes Herbert Gonzalez, Chong Yang, Mary Yang, Ma Yang, and Michael Bub.

On April 29, 2020, law enforcement seized and lawfully searched a DTO package. The package contained approximately 9 pounds of high-grade marijuana and approximately 237 grams of THC oil, which oil was packaged in one-gram quantity plastic containers. Both the THC oil and marijuana were packaged in vacuum sealed bags. Later in the day on April 29, 2020, in accordance with UPS policy, UPS opened another package addressed to Alvarado and Knueppel's address because it smelled of marijuana. The package was found to contain approximately 2,029 grams of THC oil, which was packaged in one-gram quantity plastic containers. Throughout April 29 and 30, 2020, both Perez III and Yang contacted FedEx and UPS numerous times regarding the intercepted packages.

Perez III used couriers, including Manuel Soto, Antonio Rodriguez, Hauseng Yang, and Esteban Reyes, to obtain the packages containing controlled substances

from various addresses and transport the packages to other DTO locations, including Perez Jr.'s residence, where the packages were stored until manufacture, packaging, and distribution. Hector Arenas maintained at least two stash houses where Perez III and various other DTO members were often seen coming and going around the time of suspected drug transactions. Jasmine Perez, Perez III's sister, served as a DTO nominee, leasing one of the stash apartments that was controlled by Manual Soto.

Additionally, the Perez III DTO manufactured "vape cartridges" containing THC oil at the residence of Mary Yang, Yang's sister. Under the direction of Perez III and Yang, marijuana vape cartridges were assembled by the thousands by DTO members primarily connected to Xina Yang, including Ma Yang, Mary Yang, Chong Yang, Azia Yang, Carina Rodriguez, Ger Yang, Hauseng Yang, and Michael Bub. The investigation also revealed that Sanchez and/or Sarabia also imported supplies, to include vape cartridge tubes and boxes, as confirmed by the seizure and search of five DHL packages, which contained high-end, top rated CUREpen and Rove vape cartridge boxes.

Case agents estimate based on the number of DHL boxes received by the Perez III DTO that the DTO received at least 25,000 vape cartridge boxes and empty marijuana vape pens that were imported from Hong Kong.

Perez III distributed the cocaine, marijuana, and marijuana-related products to mid-level DTO-distributors, including Manuel Soto, Antonio Rodriguez, Hauseng Yang, Hector Arenas, Luis Gomez, Jr., Ivan Galan, Esteban Reyes, Kevin Taylor, and Ger Yang. These mid-level distributors subsequently distributed the controlled substances to numerous customers in the greater Milwaukee, Wisconsin, area, at times using the third-party application Snapchat. The marijuana and marijuana-related products were distributed under the brand name "Midwest Connect" or "Midwest Connected."

Subsequently, the DTO mailed packages containing bulk currency in the form of drug proceeds to Sanchez or enlisted money couriers to transport the drug proceeds to California. Furthermore, on various occasions in 2020, Sarabia traveled to Milwaukee, Wisconsin, to obtain drug proceeds from Perez III.

Yang counted and packaged the drug proceeds that were sent to Sanchez via the United States Postal Service (USPS) at three different addresses. Ma Yang, Yang's sister, often assisted. On April 16, 2020, law enforcement searched two parcels that Perez III mailed to Sanchez, pursuant to sneak and peak warrants. The search revealed that each parcel contained $20,000 in U.S. currency hidden in magazines. The money was meticulously taped between the various magazine pages to conceal the parcels' true contents.

Although Perez III and/or Yang used aliases and unrelated addresses to ship the packages, post office video surveillance, court-ordered location data from tracking devices on their vehicles and telephones, and court-authorized intercepted communications confirmed their association with the packages.

Since at least December 11, 2019, Perez III and Yang mailed at least 87 packages, believed to contain bulk U.S. currency, to Sanchez in California, using the United States Postal Service (USPS). Based upon DTO records, the DTO mailed approximately $1.7 million in drug proceeds in a six-month period. In July 2020, Perez III mailed three USPS parcels containing a total of $60,000 to Sanchez. All three parcels were believed to be stolen, prompting the DTO to stop mailing drug proceeds, and instead use couriers to deliver bulk currency to Sanchez.

## Defendant -- Louis Rey Perez, Jr., a/k/a "Pops"

On or about June 23, 2020, Perez Jr. reported to a federal correctional institution after receiving a 60-month sentence in the District of Utah related to the September 2018, traffic stop where eight DTO kilograms of cocaine were discovered in the truck driven by Perez Jr. Prior to his incarceration at a federal correctional institution and after conviction, the investigation revealed that Perez Jr. assisted the Perez III DTO by accepting packages at his prior residence, 4xx E. Morgan Avenue, as well as storing packages that contained controlled substances at his residence, transporting those packages to other DTO locations, and storing DTO drug proceeds. Intercepted communications demonstrate that Perez Jr. was aware of the drug trafficking activities of members of the Perez III DTO and allowed DTO members access to Perez Jr.'s residence to promote activities of the DTO. Between March 20, 2020, and June 8, 2020, after his conviction in the District of Utah, approximately 138 intercepted calls and/or text messages between Perez Jr. and Perez III and/or Xina Yang were deemed criminal and pertinent in nature.

For example, on March 24, 2020, at 11:28 a.m., Perez III, using Target Telephone 1, called Perez Jr. at (414) 208-xxxx. During the conversation, Perez III told Perez Jr., "Hey, I'm on my way man. I gotta go pick that up man. I already talk…" Perez Jr. stated, "Alright, then." Case agents observed Perez III in the immediate vicinity of 33xx S. 17th Street at approximately 11:37 a.m. and then he left the area. At 5:56 p.m., Perez III retrieved a package from 33xx S. 17th Street and was surveilled to the area of 4xx E. Morgan Avenue. At approximately 6:04 p.m., case agents observed, through remote surveillance, Perez III arrive at 4xx E. Morgan Avenue and exit a white Acura sedan. Codefendant Estaban Reyes, a DTO member, was observed carrying the package that Perez III had been observed carrying out of 33xx S. 17th Street into the residence of 4xx E. Morgan Avenue, the residence of Perez Jr.

Additionally, on March 30, 2020, surveillance identified that Perez Jr. helped move 29 boxes from 4xx E. Morgan Avenue to Mary Yang's residence. As stated

6

above, Mary Yang's residence housed the marijuana vape manufacturing factory. Likewise, on April 6, 2020, and May 27, 2020, respectively, surveillance captured Perez Jr. assisting in the removal of multiple boxes from his residence at 4xx E. Morgan Avenue. Based upon their familiarity with the investigation, case agents believe that these boxes contained either marijuana, marijuana derivatives or empty marijuana vape cartridges.

On March 31, 2020, at 6:23 p.m., Perez III, using Target Telephone 1, called Xina Yang, at Target Telephone 4. During this call, Xina Yang stated, "I was trynna call you 'cause your dad's and what his name, and what his name got delivered." Perez III asked, "My dad's?" Xina Yang replied, "Yeah." Perez III stated, "I've been right here all this time, at my dad's." Xina Yang stated, "Its deliver. It said it deliver." Case agents are aware that Xina Yang was tracking the packages containing suspected controlled substances that were being delivered to various addresses in Milwaukee. Perez III stated, "What the fuck?" Xina asked, "You got it?" Perez III answered, "No." Xina Yang stated, "Huh." Perez III asked, "At my dad's? No." XINA stated, "No, Carlos' and your dad, I mean Carlos' and Hauseng's, (Xina Yang's brother and codefendant Hauseng Yang) the ones that delivers?" Perez III asked, "Hauseng's and my dad's?" Xina Yang stated, "Carlos and Hauseng's." Perez III asked, "Oh, not my dad's?" Xina Yang replied, "No your dad did for the DHL ones." Case agents believe that multiple packages were being delivered to different addresses that day. Xina Yang and Perez III discussed which packages were sent to which address. Further, that Perez Jr. was supposed to receive the DHL packages containing marijuana vape paraphernalia at his residence. Xina Yang stated, "He sent out another one. I was just, I don't know if you wanna wait." Perez III replied, "He [U/I] grab it." Case agents believe that codefendant Julian Sanchez sent additional packages to Perez III that would be arriving later that day.

On April 7, 2020, at 4:19 p.m., Perez III, using Target Telephone 1, received an incoming text message from Perez Jr., using (414) 208-xxxx, which stated, "I went to the bank son." At 4:22 p.m., Perez III, using Target Telephone 1, responded, "Ok." Based upon their training, experience, and familiarity with this investigation, case agents believe that Perez Jr. informed Perez III that Perez Jr. had drug proceeds in his possession for Perez III. ("I went to the bank son."). A previous call between Perez III, using Target Telephone 1, and Perez Jr., using (414) 208-xxxx, revealed that Perez Jr. stored at least some of the DTO drug proceeds at his residence located at 4xx E. Morgan Avenue. Specifically, on March 30, 2020, at 10:46 p.m., Perez III called Perez Jr. and asked Perez Jr. to go into the bedroom and open a box, and further stated, "I had my money in that red box." Perez Jr. responded, "The Nike one?" Perez III responded, "Yeah." During this call, Perez III expressed concern that the money was missing and told Perez Jr. that Perez III would come to Perez Jr.'s residence to check on the money because Perez III had "left some money there, Pops."

On April 28, 2020, at 8:48 p.m., Perez III, using Target Telephone 1, called Perez Jr. at (414) 208-xxxx. During this call, Perez III stated, "Hey I was gonna tell you um... hey I was gonna tell you too Pops, that tomorrow I got those tattoo guns coming." Based upon their training, experience, and familiarity with the investigation, case agents believe this to mean that Perez III informed Perez Jr. that a package containing controlled substances was going to be delivered to Perez Jr.'s residence. Perez Jr. stated, "Okay that's fine." Perez III stated, "If you can keep an eye out for me." Perez Jr. reiterated, "That's fine." Perez III replied, "Alright Pops thank you." Based upon their training, experience, and familiarity with the investigation, case agents believe that Perez III asked Perez Jr. to watch out for the package and retrieve it upon its arrival.

On May 5, 2020, at 9:33 a.m., Perez III, using Target Telephone 1, placed on outgoing call to Perez Jr. at telephone number (414) 208-xxxx. The call went to voicemail but prior to hanging up, Perez III was overheard stating, "Babe, they just got delivered (U/I) will grab them, right?" Case agents believe that Perez III was tracking a package containing controlled substances and observed that the package had been delivered to Perez Jr.'s residence at 4xx E. Morgan Avenue. At 10:07 a.m., Perez III received an incoming text message from Perez Jr., which read: "Call me." Shortly thereafter, Perez III received an incoming phone call on Target Telephone 1 from Perez Jr. During the conversation Perez III stated, "Ey, never mind Pops. I picked it up, man." Case agents reviewed video from the covert video recorder at 4xx E. Morgan Avenue. At approximately 9:28 a.m., a FedEx delivery truck was observed in front of 4xx E. Morgan Avenue, and a delivery driver placed a package on the front porch of 4xx E. Morgan Avenue. At approximately 9:55 a.m., Perez III was observed parking in front of 4xx E. Morgan Avenue and was observed via the remote surveillance camera retrieving the package from the porch of 4xx E. Morgan Avenue.

On June 12, 2020, at 8:39 p.m., Jasmine Perez, Perez III's sister and Perez Jr.'s daughter, using (414) 731-xxxx, called Perez III, using Target Telephone 1. Jasmine Perez gave the phone to Louis Perez Jr., and Perez III stated, "Hey Pops, I was gonna see, hey can you-- um, can you help me out with the 1,000 of those puzzle pieces?" Perez Jr. stated, "That's fine, I will go count them right now." Perez III replied, "Alright, I'll be on my way. Just whatever you could and then..." Perez Jr. reiterated, "That's fine." Case agents believe that during this call Perez III asked Perez Jr. to count out 1,000 vape cartridges for Perez III to pick up for distribution.

## Sources of Information

Sources of information (SOI) provided first-hand information regarding Louis Perez, Jr.'s drug trafficking activities that corroborated information developed during the course of the investigation.

8

SOI-5 indicated that when SOI-5 became heavily involved in the Perez III DTO, Perez III resided in California full-time and traveled back and forth to Milwaukee. On three to four occasions, SOI-5 went to Perez Jr.'s residence at 4xx E. Morgan Avenue in Milwaukee to obtain large amounts of money (drug proceeds) that Perez III stored at Perez Jr.'s residence. On each occasion, SOI-5 obtained between $60,000 and $100,000 in U.S. currency from Perez Jr. that Perez III obtained through drug trafficking. SOI-5 stated that on each occasion, SOI-5 obtained the cash directly from Perez Jr. SOI-5 further stated that while Perez III was in California, Jasmine Perez would normally collect the money from Perez III's customers and bring the money to Perez Jr. at Perez Jr.'s residence where it would be stored until it was needed by Perez III.

SOI-5 further stated that Perez Jr. stored Perez III's money in the basement laundry room area of the residence above the ceiling tiles or inside of the washing machine. SOI-5 further stated that these trips occurred after Perez Jr. had been arrested in Utah with eight kilograms of cocaine.

On one additional occasion, SOI-5 recalled that Perez Jr. had Perez III's money stored in a safe in a hall closet in the upstairs of the residence. On this occasion, Perez III was back in Milwaukee along with SOI-5. In the presence of SOI-5, Perez III called Perez Jr. on the phone and asked Perez Jr. where the money was stored. Perez Jr. told Perez III that Perez III's money was in the safe in the closet, which Perez III then retrieved. SOI-5 could hear Perez III on the phone with Perez Jr. and Perez Jr. directed Perez III to the safe to retrieve the money. Perez III gave SOI-5 somewhere between $60,000 and $100,000 for future marijuana purchases.

SOI-5 stated that while SOI-5 was at the residence, Jasmine Perez and Perez Jr. would count the money in front of SOI-5. SOI-5 stated that the money was already wrapped in rubber bands in bundles, but Jasmine and Perez Jr. would double count the money to make sure the amount was accurate. SOI-5 stated that Jasmine and Perez Jr. spoke in English while counting the money so SOI-5 was able to understand how much money was being counted. SOI-5 stated that sometimes Perez III would be on the phone with Perez Jr. and would tell Perez Jr. how much money to give SOI-5, and that SOI-5 could hear Perez III tell Perez Jr. to "put away" the additional money because it was not needed at that time. After obtaining the money from Perez Jr., SOI-5 would take the money back to California for Perez III and then SOI-5 would use that money to obtain more marijuana for the DTO.

SOI-5 further stated that initially he had met Perez Jr. at Perez III's house. Perez Jr. told SOI-5 that they were "family" now and that Perez Jr. "knew what he was getting into."

Over the period of a year, SOI-5 also sent marijuana packages to 4xx E. Morgan Avenue on multiple occasions. SOI-5 was responsible for sending multiple

9

packages containing marijuana or its derivatives to multiple addresses in Milwaukee for the DTO. Perez III told SOI-5 where to send the packages of marijuana and provided the addresses. After Perez Jr. was sentenced in his Utah case, Perez III told SOI-5 not to send any more marijuana packages to 4xx E. Morgan Avenue. On several occasions, SOI-5 sent packages to 4xx E. Morgan Avenue and Perez III was unhappy.

Additionally, SOI-6 indicated that SOI-6 stored parcels of marijuana that had been mailed to the different addresses at Louis Perez Jr.'s residence. The parcels were stored at 4xx E. Morgan Avenue until the marijuana could be distributed. SOI-6 further related that in 2019 while Louis Perez Jr. was out on bail, large quantities of Perez III and Xina Yang's drug proceeds were kept at Louis Perez Jr.'s residence. SOI-6 directly observed large quantities of Perez III and Xina Yang's drug proceeds stored at the residence in the basement inside of the dryer. Furthermore, large amounts of money were stored in the rafters along the foundation line in the basement. The DTO drug proceeds were stored at the residence until either Perez III or Xina Yang directed SOI-6 to give the money to someone. SOI-6 recalled giving the money to codefendants Mary Yang, Chong Yang, and Julian Sanchez at Louis Perez III's residence.

SOI-7 was also familiar with Louis Perez, Jr., and had been present at 4xx E. Morgan Avenue with Louis Perez, Jr., whom he knew as "Pops." SOI-7 indicated that Perez Jr. knew there was marijuana in many of the packages received at his house as well as marijuana vape cartridge materials. SOI-7 also indicated that Perez Jr. knew that Perez III was selling cocaine and marijuana. Perez Jr. was also aware of the "pen factory" at codefendant Mary Yang's residence. SOI-7 stated that Perez Jr. allowed the DTO to ship packages to Perez Jr.'s house, allowed marijuana to be stored at Perez Jr.'s house and allowed unopened packages to be stored at Perez Jr.'s residence as well until the DTO needed them for distribution. Perez Jr. also assisted with removing shipping labels from the packages while the packages were at his residence. Additionally, Perez Jr. also helped transport packages to Mary Yang's residence with SOI-7 and other DTO members.

SOI-7 also stated that Perez Jr. allowed Perez III and Xina Yang to store drug proceeds at 4xx E. Morgan while Perez III and Yang were in California. On occasion, Perez Jr. continued to allow Perez III and Xina Yang to store drug proceeds at his residence after they moved back to Milwaukee.

Perez Jr. also discussed with SOI-7 the trap compartment that was in the vehicle that Perez Jr. was driving when Perez Jr. was stopped with the eight kilograms of cocaine in Utah. SOI-7 stated that as a gift for taking the cocaine case, Perez III purchased Perez Jr.'s white truck for Perez Jr. SOI-7 further related that prior to being stopped with the eight kilograms of cocaine, Perez Jr. and "Nano," codefendant Antonio Rodriguez's brother, had transported kilogram quantities of

10

cocaine for Perez III and Xina Yang from California back to Milwaukee. Perez Jr. and "Nano" made it back to Milwaukee without incident.[1]

Based upon the evidence, Louis Perez, Jr., is responsible for the distribution of at least 1,000 kilograms of a mixture and substance containing marijuana, a Schedule I controlled substance.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

7.     The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment, fine, and supervised release:

>    COUNT ONE: 40 years and a $5,000,000 fine. This Count also carries a mandatory minimum of 5 years of imprisonment, at least 4 years and a maximum life term of supervised release, and a mandatory special assessment of $100.

8.     The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## PROOF OF DRUG WEIGHT FOR STATUTORY MAXIMUM PENALTY

9.     The parties understand and agree that for the penalties in 21 U.S.C. §841(b)(1)(B) to apply, as provided in paragraph 7 above, the government must prove beyond a reasonable doubt that the offense to which the defendant is pleading

---

[1] Case agents know that "Nano" is Geronimo Rodriguez, codefendant Antonio Rodriguez's brother, and also a known Mexican Posse gang member.

11

guilty involved at least 100 kilograms of marijuana. The defendant agrees that the government possesses sufficient, admissible evidence to meet this burden.

## DISMISSAL OF INDICTMENT

10. The government agrees to move to dismiss the Indictment as to Louis Perez, Jr., at the time of sentencing

## ELEMENTS

11. The parties understand and agree that in order to sustain the charge of conspiracy to possess with the intent to distribute or to distribute a controlled substance as set forth in the Information, in violation of 21 U.S.C. §§ 841(a)(1) and 846, the government must prove each of the following propositions beyond a reasonable doubt:

First, the conspiracy, as alleged in the Information, existed; and

Second, the defendant knowingly and intentionally joined the conspiracy with the intention to further the conspiracy.

## SENTENCING PROVISIONS

12. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

13. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the

12

court will give due regard to the Sentencing Guidelines when sentencing the defendant.

14.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 5. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

15.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

<u>Sentencing Guidelines Calculations</u>

16.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

13

## Relevant Conduct

17.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

18.     The parties agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is at least 1,000 kilograms but less than 3,000 kilograms of a mixture and substance containing marijuana, a Schedule I controlled substance.

## Base Offense Level

19.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offenses charged in the Information is 30 under Sentencing Guidelines Manual § 2D1.1(c)(5.).

## Acceptance of Responsibility

20.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

14

## Sentencing Recommendations

21.      Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offenses as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

22.      Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

23.      The government agrees to recommend a sentence of 96 months wholly concurrent to the sentence imposed in Case No. 18-CR-114, *United States v. Louis Perez, Jr.,* (District of Utah), or in other words, sixty months concurrent from the date of sentencing in the instant case.

## Court's Determinations at Sentencing

24.      The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

15

25.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

26.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction.  The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule.  The defendant agrees not to request any delay or stay in payment of any and all financial obligations.  If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

27.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

### Special Assessment

28.     The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

16

## DEFENDANT'S WAIVER OF RIGHTS

29.    In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a.    If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b.    If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

    d.    At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying on to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

    e.    At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

30.     The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

31.     The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

32.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

### Further Civil or Administrative Action

33.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to

18

take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

34. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

35. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

36. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

37. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offenses on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

38. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to

19

sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing.

## VOLUNTARINESS OF DEFENDANT'S PLEA

39.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 8.22.2022

LOUIS REY PEREZ, JR.
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 8/22/22

KATHLEEN QUINN
Attorney for Defendant

For the United States of America:

Date: 8/22/22

RICHARD G. FROHLING
United States Attorney

Date: 8/22/22

GAIL J. HOFFMAN
ELIZABETH M. MONFILS
Assistant United States Attorneys

21